UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
MICHAEL D. COHEN,

                              Plaintiff,

        -against-

UNITED STATES OF AMERICA,
DONALD J. TRUMP, former President of
the United States, WILLIAM BARR, former
Attorney General of the United States, MICHAEL
CARVAJAL, Director of the Bureau of Prisons,
JON GUSTIN, Administrator of the Residential
Reentry Management Branch of the Bureau of Prisons,
PATRICK McFARLAND, Residential Reentry
Manager of the Federal Bureau of Prisons,
JAMES PETRUCCI, Warden of FCI Otisville,
ENID FEBUS, Supervisory Probation Officer
of the United States Probation and Pretrial Services
ADAM PAKULA, Probation Officer of the
United States Probation and Pretrial Services,
and JOHN and JANE DOE (1-10) agents, servants,
and employees of the United States,

                            Defendants,

------------------------------------------------------------------X

Case No.: 21 CV 10774

**COMPLAINT AND DEMAND
FOR A JURY TRIAL**

Plaintiff MICHAEL D. COHEN, by his attorneys, Andrew C. Laufer of the Law Office of

Andrew C. Laufer, PLLC and Jeffrey K. Levine of the Law Office of Jeffrey K. Levine as and

for his complaint against the defendants alleges as follows:

## PRELIMINARY STATEMENT

1.    This civil rights action seeks redress under the Federal Tort Claims Act and *Bivens v. Six*

    *Unknown Named Agents of Federal Bureau of Narcotics* for injuries plaintiff suffered

    from the unconstitutional and unlawful conduct of defendants, UNITED STATES OF

    AMERICA ("United States"), DONALD J. TRUMP, former President of the United

    States, WILLIAM BARR, former Attorney General of the United States, MICHAEL

1

CARVAJAL, Director of the Federal Bureau of Prisons, JON GUSTIN, Administrator of the Residential Reentry Management Branch of the Federal Bureau of Prisons, PATRICK McFARLAND, Residential Reentry Manager of the Federal Bureau of Prisons, JAMES PETRUCCI, Warden of FCI Otisville, ENID FEBUS, Supervisory Probation Officer of the United States Probation and Pretrial Services ADAM PAKULA, Probation Officer of the United States Probation and Pretrial Services, and JOHN and JANE DOE (1-10) agents, servants, and employees of the United States.

2.    Plaintiff, Michael D. Cohen, was retaliated against by the defendants for the lawful exercise of his First Amendment right to free speech, in relation to his public comments and upcoming publication of a book shortly before the 2020 election, critical of the former President of the United States, Donald J. Trump.

3.    Specifically, Mr. Cohen sought to inform the public about the former President's private and public life involving both the presidency and business dealings.

4.    After pleading guilty to various crimes, including lying to Congress and campaign finance violations, committed in coordination with and at the direction of defendant Trump, Mr. Cohen was sentenced and held at FCI Otisville between May 2019 and May 2020.

5.    On or about April 2020, the Federal Bureau of Prisons ("FBOP") determined that Mr. Cohen was at high risk for serious illness and death related to the COVID-19 pandemic and was later placed on furlough status and returned to his residence in New York County.

6.  At the end of his furlough period, it was determined that Mr. Cohen would transition to home confinement in order to serve the remaining portion of his sentence.

7.  During the furlough time-period, Mr. Cohen made various public statements demonstrating his intent to publish a tell-all book about President Trump in short order.

8.  One of these statements was made via the social media platform, Twitter. On June 26, 2020 he tweeted #WillSpeakSoon. On July 2, 2020, Mr. Cohen tweeted that he has almost completed his book about his experiences with President Trump.

9.  On or about July 7, 2020 Mr. Cohen was contacted by an entity known as GEO — a third-party contractor who acted on behalf of the FBOP.

10. GEO's role was to transition Mr. Cohen from furlough status to home confinement status at his New York County residence and would then supervise Mr. Cohen's residential reentry, attach and monitor plaintiff with an ankle location monitoring system and enforce other rules.

11. GEO scheduled Mr. Cohen's transition for July 9, 2020 at his residence.

12. Mr. Cohen understood and agreed to comply with GEO.

13. At the last minute, Mr. Cohen was contacted by defendant Adam Pakula on July 8, 2020 to advise that GEO was being discharged and the United States Probation and Pretrial Services would assume GEO's role over Mr. Cohen.

14. Defendant McFarland authorized defendant Pakula to direct Mr. Cohen leave his upper east side residence and travel downtown on the following day, July 9, 2020, to appear at the United States Probation and Pretrial Services office located in lower Manhattan within the United States Southern District Courthouse at 500 Pearl Street.

15.    Defendant Pakula explained Mr. Cohen needed to review some home confinement transition paperwork at the Courthouse office. Thereafter, defendant Pakula and various United States officers would travel uptown to Mr. Cohen's residence where the transition meeting would continue and fit plaintiff with an ankle location monitoring system.

16.    As with GEO, Mr. Cohen had no objection, understood what was expected of him and looked forward to home confinement status.

17.    On July 9, 2020, merely one week after the plaintiff's July 2nd tweet, Mr. Cohen was presented with a Federal Location Monitoring Program Participant Agreement (hereinafter FLM), in order to transition to home confinement, and which agreement required his signature.

18.    The very first condition within the agreement specifically forbade Mr. Cohen from speaking to or through all media, including publishing his tell-all book about then President Trump.

19.    The FML condition read as follows:

> "No engagement of any kind with of the media, including print, tv, film, books, or any other form of media/news. Prohibition from all social media platforms. No posting on social media and a requirement that you communicate with friends and family to exercise discretion in not posting on your behalf or posting any information about you. The purpose is to avoid glamorizing or bringing publicity to your status as a sentenced inmate serving a custodial term in the community."

20.    This "condition," completely uncharacteristic for an FLM, was a *prima facie* violation of Mr. Cohen's constitutional rights under the First Amendment as well as in retaliation for his public comments and proposed publication of his tell-all book critical of President Trump.

21.   Mr. Cohen sought clarification and possible revision of the proposed limitations within his home confinement FLM agreement.

22.   Defendants stated they had to confer with their superiors to determine whether they could further clarify or revise the media contact limitations and directed Mr. Cohen to remain in their waiting room.

23.   During the supposed "conferring", Mr. Cohen waited for approximately 1½ hours in their waiting room.

24.   Rather than reengage with Mr. Cohen about clarification and possible revision defendants instead remanded plaintiff to FCI Otisville to serve the rest of his sentence.

25.   Due to the COVID-19 pandemic, this remand placed Mr. Cohen's life in danger.

26.   Defendants were readily aware, yet unconcerned with the risk of serious illness and death remanding Mr. Cohen could cause and which would unilaterally alter plaintiff's sentence imposed by the Court.

27.   Upon plaintiff's arrival at FCI Otisville, defendant Petrucci placed and/or was jointly responsible for placing Mr. Cohen in solitary confinement where he remained for approximately sixteen (16) days.

28.   On July 23, 2020 the Honorable Alvin K. Hellerstein, USDJ issued an Order granting a preliminary injunction directing defendants to immediately release Mr. Cohen to home confinement. The Court further held that defendants " . . . purpose in transferring Cohen from release on furlough and home confinement back to custody was retaliatory in response to Cohen desiring to exercise his First Amendment rights to publish a book

critical of the President and to discuss the book on social media." (See Exhibit A – Order of the Hon. Alvin K. Hellerstein, USDJ attached hereto.)

29. Plaintiff seeks redress for the extreme physical and emotional harm he suffered as a result of the conduct of all defendants, and for the pain and suffering he continues to experience.

## JURISDICTION AND VENUE

30. This Court has jurisdiction over the subject matter of this complaint under 28 U.S.C. §§ 1331, 1346(b), 28 U.S.C. §2671, *et. seq.*, Federal Tort Claims Act, and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1972).

31. On or about June 15, 2021, plaintiff filed a claim under the Federal Tort Claims Act demanding damages of a set sum and has satisfied the jurisdictional prerequisites.

32. To date, neither plaintiff nor his counsel received a response to the aforementioned claim and more than 6 months has passed since its filing.

33. Venue is properly within the Southern District of New York under 28 U.S.C. §1402(b) and 28 U.S.C. §1391(b)(2) as the acts and omissions that are the subject of this complaint occurred within this district.

## JURY TRIAL DEMAND

34. Plaintiff demands a trial by jury on all issues in this action which are so triable.

## PARTIES

35. At all times relevant herein plaintiff, Michael D. Cohen, is a resident of the county, city, and state of New York.

36.    At all times relevant herein plaintiff was formally under the custodial, supervisory, and disciplinary authority of all defendants.

37.    At all times relevant herein, defendant Donald J. Trump was President of the United States and is being sued in his individual capacity. As President, he was head of the Executive Branch of the Federal Government. He was responsible for the oversight and enforcement of the laws of the United States. Defendant Trump issued specific directives and guidance to his co-defendants that governed the treatment of plaintiff and others who he believed were his political enemies. At his direction, plaintiff was remanded back to prison and subjected to great indignities when he was unlawfully incarcerated and held in solitary confinement.

38.    At all times relevant herein, defendant William Barr was Attorney General of the United States and is being sued in his individual capacity. As Attorney General, defendant Barr was head of the Department of Justice and chief law enforcement officer of the Federal Government. He was responsible for the oversight of the FBOP. Defendant Barr issued directives and guidance to his co-defendants which specifically governed the care, custody, and control of plaintiff. At the behest of then President Trump, and upon his own volition, defendant Barr directed his subordinates to retaliate against plaintiff for the lawful exercise of his First Amendment rights by remanding him back to prison, and placing and/or was jointly responsible for placing him in solitary confinement at FCI Otisville.

39.    At all times relevant herein, defendant Michael Carvajal was Director of the FBOP and is being sued in his individual capacity. As Director of the FBOP, defendant Carvajal

oversaw operations of all prisons and detention facilities in the United States prison system and was responsible for the oversight and management of FCI Otisville. He specifically issued directives and guidance to his co-defendants which specifically governed the care, custody, and control of plaintiff. At the behest of his superiors, Trump and Barr, and upon his own volition, defendant Carvajal directed his subordinates to retaliate against plaintiff for the lawful exercise of his First Amendment rights by remanding him back to prison, and placing and/or was jointly responsible for placing him in solitary confinement at FCI Otisville.

40.     At all times relevant herein, defendant James Petrucci was Warden of FCI Otisville. As Warden of FCI Otisville, defendant Petrucci oversaw operations of the prison and is responsible for its oversight and management. He specifically issued directives and guidance to his co-defendants which specifically governed the care, custody, and control of the plaintiff. At the behest of his superiors, and upon his own volition, defendant Petrucci directed his subordinates to retaliate against plaintiff for the lawful exercise of his First Amendment rights by remanding him back to prison, and placing and/or was jointly responsible for placing him in solitary confinement at FCI Otisville.

41.     At all times relevant herein, defendant Jon Gustin was Administrator of the Residential Reentry Management Branch of the FBOP. As administrator, he oversaw transferring of prisoners to home confinement and was responsible for the programs oversight and management. Defendant Gustin specifically issued directives and guidance to his co-defendants which specifically governed the care, custody, and control of plaintiff. At the behest of his superiors, and upon his own volition, defendant Gustin directed his

subordinates to retaliate against plaintiff for the lawful exercise of his First Amendment rights by remanding him back to prison, and placing and/or was jointly responsible for placing him in solitary confinement at FCI Otisville.

42.    At all times relevant herein, defendant Patrick McFarland was a Residential Reentry Manager of the FBOP. As manager, he oversaw the transferring of prisoners to home confinement and was responsible for the programs oversight and management. He specifically issued directives and guidance to his co-defendants which specifically governed the care, custody, and control of plaintiff. At the behest of his superiors and upon his own volition, defendant McFarland retaliated against plaintiff for the lawful exercise of his First Amendment rights by remanding him back to prison, and placing and/or was jointly responsible for placing him in solitary confinement at FCI Otisville.

43.    At all times relevant herein, defendant Enid Febus was a Supervisory Probation Officer of the United States Probation and Pretrial Services. She was responsible for the care custody and control of plaintiff in the oversight, maintenance, and control of his home confinement and post-prison sentence. Defendant Febus specifically issued directives and guidance to her co-defendants which specifically governed the care, custody, and control of plaintiff. At the behest of her superiors and upon her own volition, defendant Febus directed her subordinates to retaliate against plaintiff for the lawful exercise of his First Amendment rights by remanding him back to prison, and placing and/or was jointly responsible for placing him in solitary confinement at FCI Otisville.

44.    At all times relevant herein, Adam Pakula was a Probation Officer of the United States Probation and Pretrial Services. He was responsible for the care custody and control of

9

plaintiff in the oversight, maintenance, and control of his home confinement and post-prison sentence. Defendant Pakula issued directives and guidance which specifically governed the care, custody, and control of plaintiff. At the behest of his superiors and upon his own volition, defendant Pakula retaliated against plaintiff for the lawful exercise of his First Amendment rights by remanding him back to prison, and placing and/or was jointly responsible for placing him in solitary confinement at FCI Otisville.

45.   At all times relevant herein, defendants JOHN and JANE DOE (1-10) were agents, servants, and employees of the United States who were responsible for the retaliation and unlawful incarceration of plaintiff whose identities are unknown at this time.

46.   At all times relevant herein, defendant United States owned, operated, maintained and controlled the Department of Justice, Federal Bureau of Prisons, the Residential Reentry Management Office, the United States Probation and Pretrial Services, and the correctional facility FCI Otisville in the state of New York, and is the appropriate defendant under the Federal Torts Claim Act ("FTCA").

47.   At all times relevant herein, the individual defendants acted within the course and scope of their employment and under color of law. Plaintiff is suing them in their individual capacity.

## FACTUAL ALLEGATIONS

### *Mr. Cohen's Prior Involvement with the former President*

48.   Mr. Cohen was previously employed by the former President, Donald J. Trump as an attorney and personal advisor in excess of one decade.

49.     While employed at the Trump Organization, plaintiff became a surrogate of defendant Trump during his 2016 United States Presidential campaign. Thereafter, and upon becoming personal attorney to the President of the United States, he continued to counsel and advise then President Trump on legal and personal matters.

50.     Throughout his affiliation with defendant Trump, Mr. Cohen was privy to his decision-making, businesses, campaign, and governing strategies.

51.     He also witnessed, first-hand, the way defendant Trump treated and retaliated against his perceived enemies.

52.     In August and November 2018 Mr. Cohen pleaded guilty to violations of federal law undertaken in coordination with and at the direction of defendant Trump.

53.     He was sentenced to 36 months incarceration.

54.     On May 6, 2019, Mr. Cohen voluntarily surrendered for service of his sentence at FCI Otisville.

55.     During the term of his incarceration, Mr. Cohen began working on a manuscript, which would eventually be formulated into a book[1], regarding his over decade long association with defendant Trump.

56.     The publication chronicled the arc of his experiences with defendant Trump and how, upon reflection, came to the realization that his actions in furtherance of defendant Trump's agenda ultimately led to his own downfall.

57.     Mr. Cohen publicly stated that his book concerned matters of great national concern and interest. Considering his firsthand experiences with the former President, plaintiff was

---

[1] Disloyal: A Memoir: The True Story of the Former Personal Attorney to President Donald J. Trump

privy to years of his non-public behavior which included, but was not limited to, anti-Semitic and racist remarks regarding numerous individuals including prominent members of the public such as former President Barack Obama and former President Nelson Mandela.

58.    Mr. Cohen's book included numerous quotes and documentary evidence supporting defendant Trump's unseemly non-public behavior.

59.    Further, Mr. Cohen publicly stated that his book would be unfavorable for defendant Trump and would substantiate his descriptions elicited during his Congressional testimony that then President Trump was "a cheat, a liar, a conman, a racist," among other things.

60.    Defendant Trump was aware of Mr. Cohen being witness to many years of the aforementioned unseemly conduct which would not reflect well if made public, and even more specifically, could negatively impact his 2020 run for a second term as President of the United States.

61.    Former President Trump was aware of Mr. Cohen's Congressional testimony briefly described and quoted above.

### *Mr. Cohen's Release on Furlough from FCI Otisville*

62.    Mr. Cohen's initial incarceration, prior to his unlawful remand, was uneventful. The drafting of his book during this time period was in compliance with all rules and regulations applicable to FCI Otisville.

63.    Upon completion of his sentence, Mr. Cohen was to be released from Otisville on November 22, 2021.

64.   Onset of the COVID-19 pandemic altered his sentence due to the fact that it was easily spread within the close confinement of a prison.

65.   This had special significance for Mr. Cohen due to various health comorbidities that made him highly susceptible to infection, serious injury and death from SARS-CoV-2.

66.   As a result, Mr. Cohen petitioned the defendants for early release from FCI Otisville based upon Congress's passage of the CARES Act and defendant Barr's March 26 and April 3, 2020 memorandums.

67.   On March 31, 2020, Mr. Cohen submitted his request to FBOP officials for his release on furlough and then transfer to home confinement.

68.   FBOP officials, substantiated Mr. Cohen's concerns for his health, determined that he should be released on furlough and then transferred to home confinement.

69.   On April 18, 2020, Mr. Cohen was granted furlough approval by FBOP. The furlough time period was from May 1, 2020 to May 31, 2020.

70.   Fourteen (14) days prior to plaintiff's scheduled May 1, 2020 transfer to furlough Mr. Cohen was sequestered and placed into solitary confinement for what FCI Otisville officials represented would be the standard quarantine period — plaintiff complied.

71.   Defendants, however, kept Mr. Cohen in solitary confinement for approximately 35 days rather than 14 days. Thereafter Mr. Cohen was transferred to furlough.

72.   During the furlough time period, Mr. Cohen made several public statements via Twitter regarding the imminent publishing of his tell-all book about defendant Trump. A number of those tweets were accompanied by the hashtag #WillSpeakSoon. Mr. Cohen planned to release his book by late September 2020.

*Plaintiff's Retaliatory Confinement*

73. In compliance with the directive of defendant Pakula, on July 9, 2020, Mr. Cohen, accompanied by his attorney, reported to the U.S. Probation Office in downtown Manhattan in order to transition from furlough to home confinement. They met with Probation Officer Adam Pakula and Supervisory U.S. Probation Officer Enid Febus.

74. Defendants Pakula and Febus handed them a Federal Location Monitoring Program Participant Agreement (hereinafter FLM).

75. The very first paragraph of the FLM read as follows:

> "No engagement of any kind with the media, including print, tv, film, books, or any other form of media/news. Prohibition from all social media platforms. No posting on social media and a requirement that you communicate with friends and family to exercise discretion in not posting on your behalf or posting an information about you. The purpose is to avoid glamorizing or bringing publicity to your status as a sentenced inmate serving a custodial term in the community."

76. It was painfully apparent to Mr. Cohen and his counsel that the defendants were attempting to unlawfully, and in violation of his First Amendment rights under the United States Constitution, create a chilling effect and thereby silence Mr. Cohen's right to free speech based on the prior restraint set forth therein.

77. It was obvious this prior restraint paragraph was not normally included in FLMs for those transferring from incarceration or furlough to home confinement.

78. Further, the document itself was not in the standard form issued by the defendants. It contained numerous grammatical and typographical errors, and had no legend identifying its federal form designation.

79. Mr. Cohen and his counsel inquired why this paragraph was included within the FLM as it did not appear to be standard and that it would prevent him from the publication of his book.

80. Defendant Febus insisted the proposed FLM was the standard form used and Mr. Cohen was not being treated any differently than other prisoners.

81. Defendant Pakula agreed and did not attempt in any way to correct, modify or elaborate co-defendant Febus' statement, until defendant Pakula was under oath.

82. In a July 22, 2020 signed declaration made under the penalty of perjury and submitted to the Court in *Cohen v. Barr et al, supra*, document number 23, defendant Pakula admitted in great detail how he and defendant Febus lied to plaintiff.

83. Further, the proposed FLM restrictions placed upon plaintiff's friends and family were onerous. It was questionable, in the least, how Mr. Cohen could be held responsible for the actions of others outside of his control.

84. Inquiry was made whether it would be possible for the defendants to adjust the language or remove paragraph one from the agreement since it was overly broad, burdensome, and would unreasonably restrain Mr. Cohen's rights.

85. The parties agreed to table this issue so they could take Mr. Cohen's inquiry and "run it up the chain of command."

86. After reviewing the rest of the FLM, Mr. Cohen asked some clarifying questions which were satisfactorily answered by the defendants.

87. At no point during the meeting with defendants was Mr. Cohen asked to sign the FLM agreement.

88. At no point did Mr. Cohen refuse to sign the FLM agreement, withhold consent to electronic monitoring, or any other condition of home confinement.

89. Following their review of the FLM agreement, defendants Pakula and Febus directed Mr. Cohen and his counsel to remain in the waiting area while awaiting a response from their superiors regarding paragraph one, the prior restraint provision, of the FLM.

90. After approximately 45 minutes, plaintiff's attorney inquired with defendants Pakula and Febus if everything was all right. Defendant Pakula assured him that everything was fine and they were still awaiting a response from their superiors.

91. After a total waiting time of approximately 1½ hours three United States Marshals arrived in the waiting area, served counsel with an RRC remand ordered by defendant McFarland regarding Mr. Cohen that falsely stated Mr. Cohen had "failed to agree to the terms of Federal Location Monitoring" and was being remanded for that reason.

92. United States Marshals, over the objection of counsel, shackled, handcuffed and remanded plaintiff to prison.

93. Defendant McFarland's allegation was a complete fabrication.

94. From the very start defendants had no intention of releasing Mr. Cohen to home confinement and used the onerous and unlawful "prior restraint provision" of the FLM as a predicate to remand him back to prison where they knew his life would be in danger due to his health conditions and the COVID-19 pandemic.

95. In the presence of United States Marshals plaintiff's attorney stated to co-defendants Pakula and Febus that: they knew the meeting was not finished, Mr. Cohen and he were

waiting to hear back to see what, if anything, could be adjusted in the proposed FLM, the remand order claim was untrue, and his client was willing to sign the FLM "as is".

96. Co-defendants Pakula and Febus did not deny this and instead responded that it was "out of their hands", the remand was an order from their superiors, and the proposed FLM agreement was "no longer on the table".

97. In the presence of United States Marshals Mr. Cohen repeatedly stated to co-defendants Febus and Pakula that he would sign the FLM "as is" but those offers were rebuffed.

98. Pursuant to the RRC remand order plaintiff was supposed to be remanded to MDC in Brooklyn and yet defendants violated their own remand order by transporting Mr. Cohen to MCC in Manhattan.

99. Thereafter, Mr. Cohen was transported back to Otisville and initially placed within a special segregated housing unit.

100. Plaintiff was then transferred to solitary confinement where he spent approximately 16 days.

101. During this time period, Mr. Cohen spent 23.5 hours of his day alone within a twelve by eight-foot cell. On weekends, Mr. Cohen was only permitted to leave his cell for 30 minutes.

102. Aside from the significantly increased risk of contracting COVID-19, the solitary confinement space where Mr. Cohen was imprisoned had poor ventilation, no air conditioning, and daily temperatures within plaintiff's solitary confinement cell exceeded one-hundred (100°) degrees. These conditions posed serious health risks for Mr. Cohen.

At times his blood pressure became dangerously high resulting in severe headaches, shortness of breath, and anxiety requiring immediate medical attention.

103.   While incarcerated, he was unable to proceed with the drafting of his book or make any public statements.

### Defendants Prior History of Retaliation Against Enemies of Defendant Trump and his Administration

104.   Defendants efforts to exercise prior restraint over Mr. Cohen's book was one instance in a long line of retaliatory measures engaged in by defendant Trump, his family and associates, and in the weaponization of his administration against his enemies, as with plaintiff.

105.   On June 16, 2020, the Civil Division of the U.S. Department of Justice, under the prior leadership of defendant Barr, brought a lawsuit against former National Security Advisor John Bolton to block the publication of his book, *The Room Where It Happened.* After instituting the suit, the Department of Justice filed an emergency motion seeking a temporary restraining order to stop the publication of his book. The Court denied this motion and refused to block the book's publication.

106.   On June 26, 2020, Mr. Trump's brother (through the same attorney who had sent a cease-and-desist letter to Mr. Cohen, Charles Harder), filed a lawsuit in New York State Supreme Court seeking to block the publication of Mary Trump's forthcoming book, *Too Much and Never Enough,* which promised to disclose, embarrassing yet truthful, details of her personal experiences and observations relating to defendant Trump, her uncle. The

Court denied the plaintiff's claims dismissing the action and allowed the publication of the book to occur on or about July 14, 2020.

107.   This was not the first attempt to prevent publication of Mr. Cohen's book by the defendants. On April 30, 2020, Trump Organization attorney Charles Harder sent a cease-and-desist letter to Mr. Cohen's attorney, claiming Mr. Cohen was barred by a Non-Disclosure Agreement ("NDA") from publishing his book. Mr. Cohen does not recall signing any such agreement, nor was a signed copy of it ever presented to him.

108.   On July 23, 2020 the Honorable Alvin K. Hellerstein, USDJ issued an Order granting a preliminary injunction directing defendants to release Mr. Cohen to home confinement. The Court further held that defendants " . . . purpose in transferring Cohen from release on furlough and home confinement back to custody was retaliatory in response to Cohen desiring to exercise his First Amendment rights to publish a book critical of the President and to discuss the book on social media."  (See Exhibit A – Order of the Hon. Alvin K. Hellerstein, USDJ attached hereto.)

109.   This Exhibit "A" ruling and Order by the Court was not appealed, timely or otherwise.

110.   This Exhibit "A" ruling and Order by Judge Hellerstein is law of the case.

## FIRST CAUSE OF ACTION
### Retaliation
### New York Common Law/ Federal Tort Claims Act
### (*against the United States*)

111.   Plaintiff adopts and incorporates by reference all preceding paragraphs as if said paragraphs are set forth fully herein.

112.    In the exercising of his right to free speech, the defendants did retaliate against the plaintiff by unlawfully detaining him by falsifying a violation of Federal Location Monitoring guidelines and, as a result, remanding him back to prison where he was held in solitary confinement for approximately 16 days.

113.    Plaintiff was aware of his confinement. He did not consent to it, nor was it otherwise privileged.

114.    Defendants actions were wrongful as a tort under the laws of the state of New York, and the law of the United States through the Federal Tort Claims Act, and without justification under any applicable federal statute or rule.

## SECOND CAUSE OF ACTION
**False Arrest, False Imprisonment, Abuse of Authority and Process**
**New York Common Law/ Federal Tort Claims Act**
**(against *the United States*)**

115.    Plaintiff incorporates by reference the allegation set forth in all preceding paragraphs as if fully set forth herein.

116.    When employees of the United States detained, sanctioned, and exercised legal or quasi-legal authority and process over plaintiff and in violation of his rights, and specifically in retaliation for the lawful exercise of his First Amendment rights, they used their positions of power and authority to exercise unlawful force and control over Mr. Cohen.

117.    Employees of the United States exercised this force for the purpose of unlawfully and unnecessarily wrist and ankle shackling, arresting, and unlawfully confining plaintiff.

118.    Plaintiff was aware of his arrest and confinement, did not consent to the arrest and confinement, nor were the arrest and confinement otherwise privileged.

119.    The conduct of employees of the United States caused Mr. Cohen to be deprived of his physical liberty for a period of approximately 16 days.

120.    The actions of employees of the United States were wrongful as a tort under the laws of the state of New York, and the law of the United States through the Federal Tort Claims Act, and without justification under any applicable federal statute or rule.

121.    Plaintiff is entitled to relief against defendant United States because when employees of the United States falsely arrested, imprisoned, abused their authority and process in their unlawful detention of the plaintiff, they were acting under the color of law and as agents, servants, and employees of defendant United States, acting within the course and scope of their employment, and under the supervision of the United States.

### THIRD CAUSE OF ACTION
**Negligently Failure to Protect**
**Federal Tort Claims Act**
(*against the United States*)

122.    Plaintiff adopts and incorporates by reference all preceding paragraphs as if said paragraphs are set forth fully herein.

123.    Defendant United States, had a legal duty to plaintiff as a prisoner in its care and custody to provide for the protection of inmates (18 U.S.C.S. § 4042), but breached that duty in negligently operating and managing FCI Otisville by the above described acts.

124.   As a result of the negligence of defendant United States, its agents, servants and employees, as aforesaid, plaintiff has suffered extreme emotional harm, physical injury, loss of enjoyment of life, and lost liberty.

### FOURTH CAUSE OF ACTION
**Negligent Infliction of Emotional Distress**
**New York Common Law/ Federal Tort Claims Act**
(*against the United States*)

125.   Plaintiff adopts and incorporates by reference all preceding paragraphs as if said paragraphs are set forth fully herein.

126.   When defendants retaliated against plaintiff by remanding him back to FCI Otisville, placing him in solitary confinement for approximately 16 days, and significantly increasing his risk of contracting COVID-19, they created an unreasonable risk of causing him severe emotional distress.

127.   The type of severe emotional distress defendants caused plaintiff to suffer was foreseeable.

128.   Defendants conduct caused plaintiff to suffer severe emotional distress, bodily injury, anguish, insecurity, anxiety, embarrassment, humiliation, fear, and loss of enjoyment of life.

129.   Defendants actions were wrongful as a tort under the laws of the state of New York, and the law of the United States through the Federal Tort Claims Act, and without justification under any applicable federal statute or rule.

## FIFTH CAUSE OF ACTION
**Intentional Infliction of Emotional Distress**
**New York Common Law/Federal Tort Claims Act**
(*against the United States*)

130.   Plaintiff adopts and incorporates by reference all preceding paragraphs as if said paragraphs are set forth fully herein.

131.   By intentionally subjecting plaintiff to retaliatory conduct by remanding him back to FCI Otisville, placing him in solitary confinement for approximately 16 days, and significantly increasing his risk of contracting COVID-19, defendants engaged in extreme and outrageous conduct.

132.   Defendants intended to inflict emotional distress, or they knew or should have known that severe emotional distress was the likely result of their conduct.

133.   As a result of defendants conduct, plaintiff suffered severe and lasting emotional distress, loss of enjoyment of life, lost liberty, and was otherwise damaged and injured.

134.   Defendants actions were wrongful as a tort under the laws of the state of New York, and the law of the United States through the Federal Tort Claims Act, and without justification under any applicable federal statute or rule.


## SIXTH CAUSE OF ACTION
**Negligent Hiring, Retention, Training, and Supervision**
**New York Common Law/Federal Tort Claims Act**
(*against the United States*)

135.   Plaintiff adopts and incorporates by reference all preceding paragraphs as if said paragraphs are set forth fully herein.

136.   Defendant United States, had a legal duty to plaintiff as a prisoner in its care and custody, breached that duty in negligently operating and managing FCI Otisville by, *inter alia*:

a.   Hiring and retaining agents, servants, and employees known or should have been known to defendants to be of such poor moral character, temperament, and disposition as to be totally unfit to be hired, retained and placed in charge of plaintiff.

b.   Failing to adopt, incorporate and enforce such rules, regulations, policies and procedures for the operation and management of FCI Otisville as would reasonably protect plaintiff and others being unlawfully detained or incarcerated and being exposed to a deadly viral pathogen, predicated upon defendants abuse of authority, falsifying government documentation, and other such unlawful acts of their agents, servants, and employees, including, but not limited to, the individually named defendants.

c.   Failing to properly supervise, investigate, and review the operation and management of the Department of Justice, Federal Bureau of Prisons, the United States Probation and Pretrial Services, and the correctional facility FCI Otisville in the state of New York and the activities and performance of defendants thereat.

d.   Failing to properly investigate allegations of retaliation brought against defendants and otherwise failing to discipline the perpetrators of or institute safeguards to prevent the unlawful conduct suffered by the plaintiff and others similarly situated from occurring.

137.   The aforementioned acts committed against plaintiff by defendants were a direct result of the negligence, carelessness, and recklessness of defendant United States, its agents, servants and employees, in failing to meet its duty of care to plaintiff in its screening,

hiring, training, supervising, evaluating, managing, controlling, and retaining of defendants and other agents, servants, and employees of the United States.

138.    As a result of the negligence of defendant United States, its agents, servants and employees, as aforesaid, plaintiff has suffered extreme emotional harm, physical injury, loss of enjoyment of life, and lost liberty.

<u>**SEVENTH CAUSE OF ACTION**</u>
**Violation of Plaintiff's Rights against Retaliation for Exercising his Right to Free Speech, Right against Unlawful Seizure of his Person, and to be Free from Cruel and Unusual Punishment First, Fourth, and Eighth Amendments, *Bivens* (against all *Individual Defendants*)**

139.    Plaintiff adopts and incorporates by reference all preceding paragraphs as if said paragraphs are set forth fully herein.

140.    Defendants intentionally retaliated against plaintiff for exercising his right to free speech and committed an unlawful seizure of the body of plaintiff. by unlawfully claiming a violation of Federal monitoring guidelines and remanding him back to FCI Otisville where he was placed in solitary confinement for approximately 16 days, preceded by 35 days in solitary confinement, which, in turn, posed a substantial risk of serious illness and death and caused him to suffer extreme emotional harm and physical injury in violation of his First, Fourth, and Eighth Amendment rights. Retaliatory incarceration serves no penological purpose as it is not a lawful penalty for criminal offenders in the custody of the United States Government.

141.    As a result of defendants conduct, plaintiff suffered extreme emotional harm, physical injury, and loss of enjoyment of life.

142.    The conduct of all defendants was accomplished under color of law and deprived plaintiff of rights, privileges, or immunities secured by the First, Fourth, and Eighth Amendment to the U.S. Constitution.

## REQUESTS FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court:

    a. Assume jurisdiction over this matter;

    b. Award compensatory damages to plaintiff;

    c. Award punitive damages to plaintiff;

    d. Convene and empanel a jury to consider the merits of this claim;

    e. Award plaintiff reasonable costs and interest; and

    f. Grant any other relief that the Court may deem appropriate and equitable.

Dated: New York, NY
       December 16, 2021

Respectfully Submitted,

**LAW OFFICE OF
ANDREW C. LAUFER, PLLC**

By: Andrew C. Laufer
Attorney for Plaintiff
MICHAEL D. COHEN
264 West 40th Street, Suite 604
New York, New York 10018
(212) 422-1020

**LAW OFFICE OF
JEFFREY K. LEVINE**

By: Jeffrey K. Levine
Attorney for Plaintiff
MICHAEL D. COHEN
340 West 57th Street, Suite 11E
New York, NY 10019
(212) 721-9600
JL@NYadvocate.com

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
MICHAEL D. COHEN,                                        :
                                                         :
                                    Petitioner,          :     **ORDER GRANTING**
           v.                                            :     **PRELIMINARY INJUNCTION**
                                                         :
WILLIAM  BARR,  in  his  official  capacity  as :     20 Civ. 5614 (AKH)
Attorney General of the United States, MICHAEL :
CARVAJAL, in his official capacity as Director of :
the Bureau of Prisons, and JAMES PETRUCCI, in :
his  official  capacity  as  Warden  of  the  Federal :
Correctional Institution, Otisville,                     :
                                                         :
                                    Respondents.         :
------------------------------------------------------------- X
ALVIN K. HELLERSTEIN, U.S.D.J.:

          Upon the findings and conclusions stated on the record at oral argument

conducted telephonically on July 23, 2020, Petitioner Michael D. Cohen's motion for injunctive

relief, *see* ECF No. 4, is granted as follows.

          The Court finds that Respondents' purpose in transferring Cohen from release on

furlough and home confinement back to custody was retaliatory in response to Cohen desiring to

exercise his First Amendment rights to publish a book critical of the President and to discuss the

book on social media.  Accordingly, Respondents are hereby enjoined from any continuing or

future retaliation against Cohen for exercising his First Amendment rights.  Respondents are

directed to provide Cohen with a COVID-19 test at his place of detention no later than tomorrow

morning, July 24, 2020, to report the results of that test to Cohen and to his Probation Officer

promptly when they become available, and to release Cohen from custody to any member of his

immediate family at the place of his detention at or before 2:00 p.m. tomorrow, July 24, 2020.

          Upon Cohen's release, the parties agree, and I so order, that Cohen will be subject

to the eight conditions of release set forth in the Federal Location Monitoring Agreement, *see*

ECF No. 7-2, provided, however, that adherence to condition one, except for the last sentence, is

temporary, subject to the parties' renegotiation of said temporary condition.[1]  The condition shall

be consistent with the First Amendment and legitimate penological limitations on conduct to

which the parties mutually agree or the Court subsequently orders.  The parties shall have one

week to conduct their negotiations and will, unless an extension has been granted, file a proposed

order to the Court by July 31, 2020.  I reserve continuing jurisdiction to resolve any disputes in

settling an order and enforcing same.

This order, which codifies my extemporaneous ruling at argument, is intended to

be final.  A written decision providing a fuller statement of my findings and conclusions will

follow when ready.  The Clerk is instructed to terminate the open motion (ECF No. 4).


SO ORDERED.

Dated:        July 23, 2020                          _____/s/_____
              New York, New York               ALVIN K. HELLERSTEIN
                                               United States District Judge

---

[1] Condition one provides:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Case No:
21CV10774

MICHAEL D. COHEN,

Plaintiff,

-against-

UNITED STATES OF AMERICA, DONALD J. TRUMP, former
President of the United States, WILLIAM BARR, former Attorney
General of the United States, MICHAEL CARVAJAL, Director of the
Bureau of Prisons, JON GUSTIN, Administrator of the Residential Reentry
Management Branch of the Bureau of Prisons, PATRICK McFARLAND,
Residential Reentry Manager of the Federal Bureau of Prisons, JAMES
PETRUCCI, Warden of FCI Otisville, ENID FEBUS, Supervisory Probation
Officer of the United States Probation and Pretrial Services, and ADAM PAKULA,
Probation Officer of the United States Probation and Pretrial Services, and JOHN
and JANE DOE (1-10) agents, servants, and employees of the United States,

Defendants,

---

## COMPLAINT AND DEMAND FOR A JURY TRIAL

---

LAW OFFICE OF ANDREW C. LAUFER

**Attorney(s) for Plaintiff**

Office and Post Office Address
264 W. 40th Street, Suite 604
New York, NY 10018

Tel: (212) 422 1020
Fax: (212) 422 1069

---

To:

Signature (Rule 130-1.1-a)

Print name beneath

Service of a copy of the within is hereby admitted.

Dated:

Attorney(s) for:

---

PLEASE TAKE NOTICE:

☐ NOTICE OF ENTRY
that the within is a (certified) true copy of a
duly entered in the office of the clerk of the within named court on

☐ NOTICE OF SETTLEMENT
that an order of which the within is a true copy
will be presented for settlement to the HON one of the judges of the
within named Court at
on            at            M.
Dated,

Yours, etc.

Law Office of Andrew C. Laufer